**Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000592
31-AUG-2020
07:50 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---


STATE OF HAWAIʻI, Plaintiff-Appellee, v.
KEONI I. ROSA, JR., Defendant-Appellant


NO. CAAP-18-0000592

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 1PC141000180)


AUGUST 31, 2020


GINOZA, CHIEF JUDGE, LEONARD AND HIRAOKA, JJ.

OPINION OF THE COURT BY LEONARD, J.

The principal issue in this case concerns whether the warrantless seizure of the defendant's cellular phone, incident to his warrantless arrest, was a violation of his constitutional protection against unreasonable searches and seizures because his warrantless arrest was illegal under Hawaiʻi law. Based on the applicable statutes and case law, we hold that: (1) the defendant's warrantless arrest was unlawful where probable cause

for his arrest was established nineteen days earlier, the police knew his identity and the location of his residence and even served him with a subpoena to appear in court, and the police had no obstacles preventing them from making an arrest or obtaining an arrest warrant, but delayed in making the arrest because the lead officer was busy with other cases and for strategic reasons; (2) the fact that probable cause was established by way of evidence other than a police officer's personal observations did not negate the immediacy element of a lawful warrantless arrest; (3) because the defendant's arrest was illegal, the seizure of his cellular phone was not incident to a lawful arrest; and (4) as the trial court did not reach the issue of whether the evidence obtained from the defendant's cellular phone would have been inevitably discovered, it is necessary to remand this case for further proceedings to determine whether that evidence should have been suppressed.  We also conclude, for the reasons stated herein, that the trial court did not abuse its discretion in denying the defendant's request for a new trial.

Defendant-Appellant Keoni I. Rosa, Jr. (**Rosa**) appeals from the Judgment of Conviction and Sentence (**Judgment**) entered against him and in favor of Plaintiff-Appellee the State of Hawaiʻi (**State**) on January 2, 2018, in the Circuit Court of the First Circuit (**Circuit Court**).[1]  Following a jury trial, Rosa was

---

[1]     The Honorable Rom A. Trader presided.

found guilty of one count of Continuous Sexual Assault of a Minor

under the Age of Fourteen Years, in violation of Hawaii Revised

Statutes (**HRS**) § 707-733.6 (2014),[2] and one count of Sexual

Assault in the First Degree, in violation of HRS § 707-730

(2014).[3]  Rosa was sentenced to two twenty-year terms of

---

[2]     HRS § 707-733.6 provides:

> **§ 707-733.6  Continuous sexual assault of a minor under the age of fourteen years**.  (1)  A person commits the offense of continuous sexual assault of a minor under the age of fourteen years if the person:
> (a)     Either resides in the same home with a minor under the age of fourteen years or has recurring access to the minor; and
> (b)     Engages in three or more acts of sexual penetration or sexual contact with the minor over a period of time, while the minor is under the age of fourteen years.
> (2)  To convict under this section, the trier of fact, if a jury, need unanimously agree only that the requisite number of acts have occurred; the jury need not agree on which acts constitute the requisite number.
> (3)  No other felony sex offense involving the same victim may be charged in the same proceeding with a charge under this section, unless the other charged offense occurred outside the period of the offense charged under this section, or the other offense is charged in the alternative.  A defendant may be charged with only one count under this section, unless more than one victim is involved, in which case a separate count may be charged for each victim.
> (4)  Continuous sexual assault of a minor under the age of fourteen years is a class A felony.

[3]     HRS § 707-730 provides:

> **§ 707-730  Sexual assault in the first degree**.  (1)  A person commits the offense of sexual assault in the first degree if:
> (a)     The person knowingly subjects another person to an act of sexual penetration by strong compulsion;
> (b)     The person knowingly engages in sexual penetration with another person who is less than fourteen years old;
> (c)     The person knowingly engages in sexual penetration with a person who is at least
>                                                      (continued...)

3

imprisonment, to run concurrently, with credit for time served.

I.    BACKGROUND

On January 6, 2014, the mother (**Mother**) of a minor complaining witness (**CW**) called the Honolulu Police Department (**HPD**) to report an alleged sexual assault.  HPD dispatched Officer Darren Ozaki (**Officer Ozaki**) to investigate the report, meeting Mother first, and then CW, at their residence.  CW was fourteen years old when he met with Officer Ozaki on January 6, 2014; CW was about thirteen years old at the time of the alleged incidents.

Mother and CW reported a history of multiple sexual assault incidents that occurred over the prior year at various locations, identified Rosa as the alleged assaulter, and provided information regarding communications between CW and Rosa via CW's

---

[3](...continued)

> fourteen years old but less than sixteen years old; provided that:
> (i)    The person is not less than five years older than the minor; and
> (ii)   The person is not legally married to the minor;
> (d)    The person knowingly subjects to sexual penetration another person who is mentally defective; or
> (e)    The person knowingly subjects to sexual penetration another person who is mentally incapacitated or physically helpless as a result of the influence of a substance that the actor knowingly caused to be administered to the other person without the other person's consent.
> Paragraphs (b) and (c) shall not be construed to prohibit practitioners licensed under chapter 453 or 455 from performing any act within their respective practices.
> (2)   Sexual assault in the first degree is a class A felony.

cellular phone and Rosa's cellular phone (**Rosa's Phone**). CW also told Officer Ozaki that he and Rosa exchanged naked photos and explicit text messages using their cellular phones. Officer Ozaki learned from Mother that CW had erased all of the naked photos and text messages from CW's phone. At the time of the incidents, CW reportedly used an iPhone from Verizon, but the phone number was no longer in service when he made the police report.

Officer Ozaki documented the information that he received from Mother and CW, and Officer Ozaki prepared an HPD report in the case.

On January 7, 2014, Detective Sergeant Beth Rockett (**Detective Rockett**), a detective with HPD's sex crimes detail, was assigned to investigate CW's allegations against Rosa. Officer Ozaki communicated his information to Detective Rockett. At the time she was assigned to investigate the case, Detective Rockett worked Saturdays through Wednesdays, with Thursdays and Fridays off.

An HPD "lockup arrest" (**Lockup Case**) is a case in which a suspect has already been arrested. On the weekends, Detective Rockett was one of four or five detectives assigned to cover Lockup Cases for the island of Oʻahu, and her Lockup Cases were not limited to sexual assault cases. Because suspects in Lockup

Cases are already in custody, such cases are given priority by HPD detectives, including Detective Rockett.

Detective Rockett was scheduled off from work on January 9 and January 10, 2014.  On January 9, 2014, Mother provided HPD Officer Aaron Takeuchi with additional information regarding photographs and videos of her son and other boys on Rosa's Phone.  Mother also provided Rosa's phone number and cellular service provider.

When back at work on January 11, 2014, Detective Rockett contacted CW to arrange an interview the next day.  On January 12, 2014, Detective Rockett conducted a video- and audio-recorded interview with CW.  CW alleged that Rosa's assaults began around the time CW was a sixth-grader in elementary school.  CW alleged multiple assaults at multiple public locations.  CW also alleged that Rosa showed CW pornographic images on Rosa's Phone, and that Rosa requested CW take explicit photos on his phone and send them to Rosa's Phone.  Detective Rockett presented CW with a photographic lineup; the photographic lineup consisted of six photographs, including a photograph of Rosa.  CW positively identified Rosa as the individual who sexually assaulted him.  Detective Rockett later testified that, following the interview with CW, she "knew that [she] had to eventually get a search warrant, do admin subpoenas, locate the scenes, take pictures of those scenes, that kind of stuff."  Detective Rockett

6

testified that she did not feel ready to locate and arrest Rosa after the interview with CW on January 12, 2014. However, Detective Rockett also testified that she had probable cause to arrest Rosa following her interview with CW on January 12, 2014. After the January 12, 2014 interview, Detective Rockett printed out a record of a vehicle registered to Rosa, which included Rosa's Waiʻanae residential address.

On January 14 and 15, 2014, Detective Rockett received and prioritized working on a Lockup Case in which the suspect was in custody and needed to be charged within forty-eight hours. Detective Rockett was scheduled off from work on January 16 and 17, 2014. On January 18 and 19, 2014, Detective Rockett received two additional Lockup Cases that took priority over her other cases and required her attention until January 20, 2014.

On January 21, 2014, Detective Rockett made arrangements to visit and photograph locations of alleged assaults on the following day. On January 22, 2014, Detective Rockett visited scenes of the alleged offenses and photographed various bathrooms and business establishments. Detective Rockett was scheduled off from work on January 23 and January 24, 2014.

On Saturday, January 25, 2014, along with HPD Detective Michelle Phillips (**Detective Phillips**), Detective Rockett attempted to locate Rosa at his residence to arrest him. When

7

they arrived, a vehicle was parked on the premises, but the gate was locked.  Detective Rockett called out, but there was no answer and Rosa did not appear to be present.  On January 26, 2014, Detective Rockett served two administrative subpoenas, one on Verizon (the cellular phone service provider for CW), and the other on AT&T (the cellular phone service provider for Rosa).  The subpoenas requested phone call and text message logs for each phone number.  On January 27, 2014, Detective Rockett located and photographed Rosa's car, which was parked in the driveway of Rosa's house.  Detective Rockett emailed the photograph of the vehicle to CW, and CW identified Rosa's car as the vehicle CW rode in with Rosa.

Detective Rockett learned at some point that on Friday, January 31, 2014, Rosa was scheduled to appear at a Temporary Restraining Order (**TRO**) hearing in Honolulu District Court.[4]  Since Rosa was likely to appear for the TRO hearing, Detective

---

[4]     When specifically questioned on this timing at a March 3, 2015 hearing, discussed *infra*, Sergeant Rockett testified:

>     [By Rosa's counsel] Q.  . . . You testified that [Mother] told you there was a TRO hearing on the 31st.
>     When did you learn of that? When did [Mother] tell you there was a TRO hearing on the 31st?
>
>     A.  I'm not sure when she told me.
>
>     Q.  All right.  Was it a week before -- more than a week before?
>
>     A.  I can't even guess.  I'm sorry.  I don't want to be wrong.

Rockett decided to make the arrest on that date. On January 31, 2014, at about 8:50 a.m., Detective Rockett located and arrested a male at the Honolulu District Court building, who identified himself as Rosa. After arresting Rosa, Detective Rockett conducted a search incident to arrest and recovered a white Apple iPhone from Rosa's waist area. Detective Rockett submitted the phone into evidence, pending the approval and issuance of a search warrant. Rosa was then transported to the Central Receiving Division of the Main Police Station for booking and processing.

Detective Rockett also prepared a post-arrest Affidavit in Support of Warrantless Arrest, which was signed and notarized on January 31, 2014, and later submitted into evidence at a March 3, 2015 pre-trial hearing on a motion to suppress. The affidavit stated that Detective Rockett believed that she had probable cause for Rosa's arrest and probable cause to support the extended restraint of Rosa's liberty. The facts and circumstances described in Detective Rockett's probable cause affidavit were all known to Detective Rockett on or before January 12, 2014.

Later in the afternoon of January 31, 2014, the Honorable Paul B. Wong reviewed and approved a search warrant for Rosa's residence.

On February 5, 2014, the State presented the case to an Oʻahu Grand Jury. Rosa was indicted on one count of Continuous Sexual Assault of a Minor Under the Age of Fourteen Years and one count of Sexual Assault in the First Degree, for the incidents involving CW. On February 10, 2014, Rosa was arraigned on the instant charges and entered a plea of not guilty.

Also on February 5, 2014, the Honorable Shirley M. Kawamura (**Judge Kawamura**) approved a search warrant (**Search Warrant**) for Rosa's Phone. The Search Warrant included an expiration date of February 15, 2014, and approved a search of the phone that was seized by the police when Rosa was arrested at the courthouse.

On August 29, 2014, Rosa filed a Motion to Suppress Evidence (**August Motion to Suppress**). The August Motion to Suppress argued that because Rosa's Phone was searched after the Search Warrant expired, it was searched without a valid search warrant in violation of Rosa's rights under article I, sections 6 and 7, of the Hawaiʻi State Constitution and the Fourth and Fourteenth Amendments of the United States Constitution.[5] On September 9, 2014, the State filed an opposition to the motion,

---

[5]     Rosa's argument at that time did not include that Rosa's Phone was unconstitutionally seized as a result of an illegal arrest.

arguing that a warrant had been obtained to search the phone on February 5, 2014.[6]

The August Motion to Suppress was initially set for hearing on September 23, 2014, but was continued until October 28, 2014, because Rosa was not transported to the court. On October 28, 2014, the Circuit Court orally ruled that the State did not have to obtain an additional search warrant for Rosa's Phone beyond the ten-day period set forth in the Search Warrant. Rosa's counsel informed the court that he intended to file another motion to suppress on the grounds that Rosa's Phone was seized without a warrant incident to an illegal arrest, citing State v. Keawe, 107 Hawaiʻi 1, 108 P.3d 304 (2005). Rosa also requested an extension of the pretrial hearing date and continuance of the trial, which was granted.

On December 1, 2014, Rosa filed a Second Motion to Suppress Evidence (**December Motion to Suppress**). In the December Motion to Suppress, Rosa argued that the seizure of Rosa's Phone, incident to his arrest, was in violation of his constitutional rights because his January 31, 2014 arrest was illegal, in violation of HRS § 803-1 (2014). Rosa argued, citing Keawe, that

---

[6]     HPD attempted to search Rosa's Phone shortly after the Search Warrant was issued, but the phone was passcode-locked, and HPD was unable to get past the passcode until May. The State argued in opposition to the August Motion to Suppress that the search had started within the time authorized by the Search Warrant, and that they were allowed to continue their efforts in searching to retrieve data after the warrant had expired.

Rosa's Phone must therefore be suppressed.  On December 18, 2014, the State filed a memorandum in opposition.

As noted above, at the March 3, 2015 hearing on the December Motion to Suppress, Detective Rockett testified that, on January 12, 2014, she did not feel "ready to locate and arrest" Rosa, as well as that on January 12, 2014, she did have probable cause to arrest Rosa.  Detective Rockett testified about her work schedule, other case assignments, and her steps, after January 12, 2014, in investigating CW's allegations, as described above.

Rosa testified that, about a week before the January 31, 2014 TRO hearing, he was served to appear at the hearing by an HPD officer other than Detective Rockett.  Rosa testified that he was living at the Waiʿanae address shown on his vehicle registration during the entire month of January of 2014.  Counsel for Rosa argued that the State had probable cause, had identified Rosa, and had Rosa's location.  Counsel argued that there was nothing preventing Detective Rockett from arresting, or sending somebody to arrest Rosa, starting on January 12th, or even before then, but certainly by the 12th.  Counsel further argued that: the State was able to have a police officer serve Rosa with the TRO; Detective Rockett had been to Rosa's address multiple times; and, once Detective Rockett suspected that Rosa would be at the TRO hearing, she could have obtained an arrest warrant prior to arresting Rosa at the January 31, 2014 TRO hearing.

The Circuit Court questioned Rosa's counsel on how the facts of this instant matter compared and contrasted to the facts in Keawe, as well as on the State's explanation of the delay caused by Detective Rockett's continuing investigation efforts. The court also questioned the Deputy Prosecuting Attorney on why HPD had not obtained an arrest warrant by January 31, 2014, when they intended to attempt an arrest of Rosa at the TRO hearing. In a final argument, Rosa's counsel cited State v. Line, 121 Hawaiʻi 74, 214 P.3d 613 (2009), for the proposition that "63 hours between the inception of probable cause and the July 15th, 2005, attempted arrest afforded the police ample time to obtain an arrest warrant[.]" The court then took a short recess to review Line and otherwise consider its ruling.

At the conclusion of the March 3, 2015 hearing, the Circuit Court orally denied the December Motion to Suppress. The court explained that it did not find Line to be controlling in this case. The court distinguished the facts in Keawe from the facts in this case, particularly that the police in Keawe had themselves witnessed the acts giving rise to probable cause but then "did absolutely nothing" during the time period that followed, while here the police had only received a report of the acts, and Sergeant Rockett then used the time period thereafter to further her investigation.

On March 25, 2015, the Circuit Court filed written Findings of Fact, Conclusions of Law and Order Denying [Rosa's December Motion to Suppress] (**FOFs/COLs/Order on Motion to Suppress**).

Before Rosa's jury trial began, on October 20, 2016, both the State and Rosa received a jury packet, which consisted of a list of potential jurors and redacted juror cards. On Juror Card 45, under item 13 asking for present or last employer and occupation, Juror Number 45 (**Juror 45**) wrote "OTS Handi-Van" (**Handi-Van**). On October 24, 2016, Rosa's jury trial commenced in the Circuit Court. Rosa was represented at trial by Deputy Public Defender Henry Ting (**DPD Ting**). During jury selection, Juror 45 was first seated as Alternate Juror No. 1. Both the State and Rosa had an opportunity to *voir dire* Juror 45. Neither the State nor the defense challenged Juror 45 for cause, or elected to exercise a peremptory challenge on the juror. After the jury was impaneled and sworn in, a juror was dismissed and Juror 45 was called to sit on the jury.

On November 2, 2016, Rosa took the stand and testified. Rosa provided his background information, including his employment history. One of Rosa's prior places of employment was with Handi-Van. Rosa did not provide specific information on

dates of employment, the nature of his work, or position(s) with Handi-Van.

During the recess following Rosa's testimony, Juror 45 asked to address the Circuit Court. After the other jurors cleared the room, Juror 45 notified the court that he was currently employed with Handi-Van. The court engaged in a colloquy with Juror 45 to find out more information. Juror 45 explained that while he and Rosa may have been employed by Handi-Van at the same time, Juror 45 did not know and had not worked with Rosa. Juror 45 assured the Circuit Court that, despite this common employment, he could remain fair and impartial. After Juror 45 addressed the court, the court asked both the State and Rosa if either party had any questions for this juror. Both the State and defense declined to ask Juror 45 any further questions. After Juror 45 left the courtroom, neither the State nor Rosa objected to Juror 45 remaining on the panel.

On the afternoon of November 2, 2016, the jury began deliberations. In the morning of November 3, 2016, the jury sent the following communication to the court:

> How do we read the phone call record?
> 1 Definition of tab's
>      -call direction
>      -seizure duration
> 2 How do you tell if it's a phone call vs text message.

Later on November 3, 2016, the jury returned verdicts of guilty on each count.  Juror 45 was the jury foreperson.

On November 14, 2016, DPD Ting filed a Motion for New Trial (**Motion for New Trial**) on the grounds that Juror 45 falsely represented to the Court that he did not know Rosa and did not remember ever working with Rosa.  On November 28, 2016, the State filed a memorandum in opposition.  At a December 6, 2016 hearing on the motion, DPD Ting moved to withdraw, which motion was granted.  On December 15, 2016, Rosa's present counsel (**Mr. Goo**) was appointed.  On March 25, 2017, Mr. Goo filed a Supplemental Memorandum in Support of Motion for New Trial.  The State filed a further memorandum in opposition.

On July 11, 2017, a hearing was held on Rosa's Motion for New Trial.  Rosa testified, and DPD Ting was called to testify by the State.  Because an employment record document from Handi-Van required a subpoena, the Circuit Court granted Rosa's request to continue the hearing, and it was continued.

On October 24, 2017, after further argument, the Circuit Court announced that Rosa's Motion for New Trial would be denied.  On November 13, 2017, the Circuit Court filed its Findings of Fact, Conclusions of Law and Order Denying Defendant's Motion for New Trial (**FOFs/COLs/Order on New Trial**).

II.  POINTS OF ERROR

Rosa raises two points of error on appeal, contending that the Circuit Court erred in:  (1) denying Rosa's motions to suppress Rosa's phone as evidence; and (2) denying Rosa's November 14, 2016 Motion for New Trial in its FOFs/COLs/Order on New Trial.

III. APPLICABLE STANDARDS OF REVIEW

> We review questions of constitutional law de novo, under the right/wrong standard. State v. Hauge, 103 Hawaiʻi 38, 47, 79 P.3d 131, 140 (2003). "Accordingly, '[w]e review the circuit court's ruling on a motion to suppress de novo . . .'" Id. (quoting State v. Locquiao, 100 Hawaiʻi 195, 203, 58 P.3d 1242, 1250 (2002)).

State v. Phillips, 138 Hawaiʻi 321, 357, 382 P.3d 133, 169 (2016).  "[T]he right/wrong standard . . . allows the appellate court to examine the facts and answer the question without being required to give any weight to the trial court's answer to it." State v. Russo, 141 Hawaiʻi 181, 189, 407 P.3d 137, 145 (2017) (citation and internal quotation marks omitted).  "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned."  Dan v. State, 76 Hawaiʻi 423, 428, 879 P.2d 528, 533 (1994) (citation and internal quotation marks omitted).

> Appellate courts review a circuit court's pretrial findings of fact under the clearly erroneous standard.  A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.  Substantial evidence is credible evidence which is of sufficient quality

> and probative value to enable a person of reasonable caution to support a conclusion.
>
> Pretrial conclusions of law are reviewed under the de novo standard.

State v. Ramos-Saunders, 135 Hawaiʻi 299, 302, 349 P.3d 406, 409 (App. 2015) (citations and internal quotation marks omitted).

> As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. The same principle is applied in the context of a motion for new trial premised on juror misconduct. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

State v. Yamada, 108 Hawaiʻi 474, 478, 122 P.3d 254, 258 (2005) (citation omitted).

IV.  DISCUSSION

A.  Rosa's Motion to Suppress

Rosa contends that the Circuit Court erred in denying the December Motion to Suppress because the warrantless seizure of Rosa's Phone, incident to Rosa's arrest, was a violation of Rosa's constitutional protection against unreasonable searches and seizures because Rosa's warrantless arrest was illegal.[7] Rosa argues that his arrest was illegal because there was neither a warrant for his arrest nor an applicable exception to the warrant requirement.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Hawaiʻi State Constitution

---

[7]  On appeal, Rosa makes no argument that the August Motion to Suppress was wrongly decided.

18

protect the rights of citizens to be free from unreasonable searches and seizures.  These constitutional provisions "mandate that government agents generally 'obtain search warrants based on probable cause before effecting a search and seizure of persons or places connected to criminal activity.'"  State v. Eleneki, 106 Hawaiʻi 177, 189, 102 P.3d 1075, 1087 (2004) (citing State v. Barrett, 67 Haw. 650, 653, 701 P.2d 1277, 1280 (1985)).  "The well-established rule in this jurisdiction is that warrantless searches are presumptively unreasonable unless they fall within one of the carefully defined exceptions."  State v. Wiley, 69 Haw. 589, 591, 752 P.2d 102, 103 (1988) (citing State v. Jenkins, 62 Haw. 660, 619 P.2d 108 (1980)); State v. Ortiz, 67 Haw. 181, 184, 683 P.2d 822, 825 (1984).

Hawaiʻi law recognizes exceptions to the search warrant requirement, including for a search incident to a lawful arrest. "A contemporaneous search incidental to a lawful arrest may be made for the fruits of the crime, implements used to commit the crime and for weapons."  State v. Park, 50 Haw. 275, 276, 439 P.2d 212, 213 (1968) (emphasis added) (citations omitted).  It is undisputed that Rosa's Phone was seized without a warrant and that the Circuit Court relied on the search-incident-to-lawful-arrest exception to conclude that the seizure of Rosa's Phone was lawful.

It is also undisputed that no warrant was issued for Rosa's arrest. However, the Circuit Court concluded that, pursuant to HRS § 803-5 (2014), Detective Rockett was authorized to make a warrantless arrest under the circumstances of this case. In Keawe, 107 Hawaiʻi 1, 108 P.3d 304, the Hawaiʻi Supreme Court examined the scope of the exception in HRS § 803-5 to the general rule stated in HRS § 803-1, which requires a police officer to obtain an arrest warrant prior to making an arrest, except where otherwise provided by law. These statutes provide as follows:

> **§ 803-1  Arrest; by warrant.**  No arrest of any person shall be made without first obtaining a warrant or other process therefor from some magistrate, except in the cases provided in this chapter or otherwise provided by law.
>
> **§ 803-5  By police officer without warrant.**  (a)  A police officer or other officer of justice, may, without warrant, arrest and detain for examination any person when the officer has probable cause to believe that such person has committed any offense, whether in the officer's presence or otherwise.
> (b)  For purposes of this section, a police officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that a crime has been or is being committed.

In Keawe, for the reasons explained therein, the supreme court concluded that these statutes must be interpreted to place a temporal restriction – an element of *immediacy* - on the power of the police to make a warrantless arrest pursuant to HRS § 803-5. Keawe, 107 Hawaiʻi at 5-6, 108 P.3d at 308-09. The supreme court stated, *inter alia*:

20

> We believe that this element of immediacy is present in HRS § 803-5 as well [as the other exceptions to HRS § 803-1], allowing a warrantless arrest where the police observe a crime in progress or develop probable cause to believe a crime has just occurred. This interpretation avoids the implied repeal of either HRS §§ 803-1 or 803-5 and, we believe, effectuates the legislature's actual intention in enacting HRS § 803-5.

Keawe, 107 Hawaiʻi at 6, 108 P.3d at 309.

The supreme court further clarified:

> We limit our holding to those cases, like the instant case, in which the police have probable cause to arrest, have no obstacle preventing them from making the arrest, and wait a significant amount of time before making the arrest. We reiterate the long-standing rule that a police officer may make a warrantless arrest based on probable cause; however, if the police wish to delay the arrest for tactical reasons, the police may not rely upon HRS § 803-5 to proceed without a warrant.
>
> Pursuant to HRS § 803-5, Officer Lewis [(the officer who arrested Keawe)] could have arrested Keawe on July 25, 2002 either during or immediately after Keawe's dances. If Officer Lewis believed that he needed assistance in making the arrest, HRS § 803-5 certainly allowed Officer Lewis a reasonable amount of time to call other officers to assist him. Other types of delays may be proper: for example, if the delay between the development of probable cause and the arrest occurs because the police are attempting to identify, locate, or apprehend a defendant, the arrest will satisfy HRS § 803-5. However, if the police believe that waiting days or weeks to arrest a defendant is the most appropriate action under the circumstances, as occurred in instant case, then the police cannot rely upon HRS § 803-5 and must obtain a warrant pursuant to HRS § 803-1.

Keawe, 107 Hawaiʻi at 7, 108 P.3d at 310 (citations omitted).

In Line, 121 Hawaiʻi 74, 214 P.3d 613, the supreme court revisited the issue of immediacy as it relates to whether a warrantless arrest is lawful. In Line, the supreme court explained:

> [The] police discovered Dean with a pipe that contained crystal methamphetamine on July 12, 2005, 63 hours before officers located and pursued Dean into his home on July 15, 2005. Under those facts, it does not appear that

> exigent circumstances existed such that the officers were prevented from obtaining a warrant prior to arresting Dean. **Thus, manifestly, a warrant should have been obtained.** See State v. Keawe, 107 Hawaiʻi 1, 5-7, 108 P.3d 304, 308-10 (2005) (holding that there is a "temporal restriction on the police's [ ] power to make a warrantless arrest" and "**if the police believe that waiting days or weeks to arrest a defendant is the most appropriate action under the circumstances, . . . then the police . . . must obtain a warrant**").

Id. at 83 n.19, 214 P.3d at 622 n.19 (emphasis added).

The supreme court in Line commented disapprovingly on the trial court's reliance on Keawe for the trial court's holding that "unlike Keawe, Dean's actions caused the initial delay in his arrest, and the police did not wait a 'significant amount of time' from the inception of probable cause to arrest Dean." Id. at 84, 214 P.3d at 623. The supreme court explained:

> The [trial] court in effect attempted to establish a new exception to the warrant requirement, by concluding that police do not need a warrant to enter a home as long as they do not delay "significantly" in effectuating the arrest. To the contrary, the 63 hours between the inception of probable cause and the July 15, 2005 attempted arrest afforded police ample time to obtain an arrest warrant and they were plainly required to do so[.] See Keawe, 107 Hawaiʻi at 7, 108 P.3d at 310.

Id. at 84-85, 214 P.3d at 623-24 (original brackets omitted).

While there were other issues at play in Line, the supreme court clearly rejected the trial court's attempt to water down the immediacy requirement for a warrantless arrest pursuant to HRS § 803-5 by casting a 63-hour delay between the inception of probable cause and the attempt to carry out a warrantless arrest as an insignificant delay in effectuating the arrest. The supreme court essentially characterized the trial court's ruling

22

as an attempt to establish a new exception – a the-police-did-not-wait-a-significant-amount-of-time exception – to the warrant requirement and concluded that the trial court erred in this regard.

In the case now before us, like the trial court in Line, the Circuit Court attempted to replace the immediacy requirement for the HRS § 803-5 exception with a much broader exception. Here, the Circuit Court's ruling might be described as including a reasonable-efforts-to-do-a-thorough-investigation exception, rather than any sort of temporal element tied to the establishment of probable cause. The Circuit Court's FOFs include, *inter alia*:

> 8. On January 7, 2014, [Detective Rockett] was assigned to further investigate the instant case.
>
> . . . .
>
> 14. On January 12, 2014, at the Kapolei Police Station, Detective Rockett conducted a video and audio recorded interview with [CW]. . . .
>
> 15. [CW] said the oral sex happened several times a week, and he distinctly recalled the following incidents: [multiple alleged incidents at specific locations]
>
> . . . .
>
> 19. [CW] reported multiple Sexual Assault in the First Degree incidents involving a minor.
>
> 20. On January 12, 2014, Detective Rockett presented [CW] with a photographic lineup. The photographic lineup consisted of six photographs, including a photograph of [Rosa]. [CW] positively identified [Rosa] as the individual who sexually assaulted him.
>
> . . . .

24. On January 21, 2014, Detective Rockett made arrangements to visit and photograph the scenes the following day.

25. On January 22, 2014, Detective Rockett visited the scenes of the alleged offenses and photographed the bathrooms and business establishments.

. . . .

27. **On Saturday, January 25, 2014, along with HPD Detective Michelle Phillips, Detective Rockett attempted to locate [Rosa] at his residence to effectuate the arrest.** When they arrived, a vehicle was parked on the premises, but the gate was locked. Detective Rockett called out, but there was no answer and [Rosa] did not appear to be present.

28. On January 26, 2014, Detective Rockett served two administrative subpoenas, one on Verizon (the cellular phone service provider for [CW]), and the other on AT&T (the cellular phone service provider for [Rosa]). The subpoenas requested phone call and text message logs for each phone number.

29. In addition to obtaining the administrative subpoenas, because [CW] reported that some of the offenses occurred in [Rosa]'s vehicle, Detective Rockett looked into vehicles registered to [Rosa].[8]

30. Detective Rockett conducted computer checks and learned about a 1999 white Toyota four-door sedan, bearing Hawaii State license plate number GXG875, registered to [Rosa].

31. **On January 27, 2014, Detective Rockett located and photographed the white Toyota sedan parked in the driveway of Defendant's house.**

32. **Detective Rockett emailed the photograph of the vehicle to [CW]. [CW] identified the white Toyota sedan as the vehicle he rode in with [Rosa].**

33. Detective Rockett learned that on January 31, 2014, [Rosa] had a scheduled TRO hearing in Honolulu District Court. Since [Rosa] was likely to appear for the hearing, Detective Rockett decided to make the arrest on that date.

---

[8]     At the March 3, 2015 hearing on the December Motion to Suppress, in describing her investigative actions on January 12, 2014, Detective Rockett stated that she printed out Rosa's vehicle registration, which included his home address.  Detective Rockett's print-out, which was entered into evidence at the hearing, had a date/time footer with 1/12/2014 and 1:23:56 PM.

34.  On January 31, 2014, at about 8:50 A.M., Detective Rockett located and arrested a male at 1111 Alakea Street. The male identified himself as [Rosa].

. . . .

41. The Court found [Rosa]'s warrantless arrest on January 31, 2014 valid.

42. The Court found HPD did everything they were required to do considering the nature of the allegations dated as far back as 2009.

43. The Court factually distinguished the instant case from [Keawe].

44. The Court noted that Keawe is fairly clear in establishing that police cannot skirt obligations to obtain an arrest warrant.

45. In Keawe, the police had probable cause when they directly observed a violation of the law but chose, for tactical reasons, not to arrest.

46. In Keawe, the police did not do anything for twenty (20) days to further their investigation after observing the offense.

47. **The Court held that in the instant case, HPD obtained a search warrant, thereby suggesting that they could have obtained an arrest warrant but elected not to.**

48. **The Court held that while Detective Rockett had probable cause on January 12, 2014, her investigative efforts until the time of the arrest were not unreasonable.**

49. **The Court further found that public policy supports police doing a thorough job when conducting an investigation.**

50. In the instant case, the Court found that Detective Rockett furthered her investigation by visiting the scenes, taking photographs, and attempting to locate Defendant and his vehicle to effectuate an arrest.

51. **Unlike in Keawe, where the officer observed the [offense], in the instant case, responding officers did not witness the [offense]. Because of the numerous incidents reported, Detective Rockett wanted to ensure she had "reasonably trustworthy information" and that she verified that information before making an arrest. HRS § 803-5. She wanted to visit and photograph the scenes, review the reports, prepare appropriate search warrants, and obtain and preserve evidence.**

52. **The Court held [Rosa]'s arrest did not require a formal warrant by HPD because Detective Rockett engaged in good faith diligent efforts to further her investigation.**

53. **Detective Rockett's efforts were reasonable, and she did not delay the arrest for tactical or strategic reasons, especially considering she was juggling a number of other assignments at the same time.**[9]

Thus, the Circuit Court found and concluded that Detective Rockett had probable cause to arrest Rosa on January 12, 2014, after Detective Rockett personally interviewed CW and CW again recounted numerous, very specific, incidents of sexual assault by Rosa, and CW positively identified Rosa as the individual who sexually assaulted him. While there are many findings and/or conclusions concerning the reasonableness of Detective Rockett's further investigative efforts after that date, the Circuit Court erred in ruling that a *warrantless* arrest nineteen days after probable cause was established was lawful pursuant to HRS § 803-5 based on the *reasonableness* of Detective Rockett's further *investigative action*. This ruling disregards the supreme court's fundamental rulings in Keawe, to wit:

> Keawe, on the other hand, argues that a warrantless arrest is unlawful unless, after finding probable cause, the police make the arrest "immediately or soon thereafter." . . . Keawe argues that . . . the power to arrest an individual without a warrant (provided by HRS § 803-5) is limited and should be construed narrowly. We agree.
>
> . . . .
>
> Keawe advocates an interpretation of HRS §§ 803-1 and 803-5 that would place a temporal restriction on the

_____

[9] The Circuit Court's COLs stemmed from and were consistent with these FOFs.

26

> police's HRS § 803-5 power to make a warrantless arrest. We agree.

Keawe, 107 Hawaiʻi at 5-6, 108 P.3d at 308-09 (footnote omitted).

The supreme court's limitation of its holding to cases in which "the police have probable cause to arrest, have no obstacle preventing them from making the arrest, and wait a significant amount of time before making the arrest" does not change the result in this case. See id. at 6-7, 108 P.3d at 309-10. Nothing in Detective Rockett's testimony or the Circuit Court's findings constituted an "obstacle" preventing Detective Rockett from making the arrest.[10] The police knew Rosa's identity and the location of his residence for nineteen days after probable cause was established and before his arrest. It

---

[10]    Detective Rockett's one attempt to arrest Rosa, when she went to his house on January 25, 2014, was not a sufficient obstacle to make Rosa's warrantless arrest - nineteen days after probable cause was established - lawful under HRS § 803-5. See Line, 121 Hawaiʻi at 84-85, 214 P.3d at 623-24; see also State v. Parras, CAAP-15-0000532, CAAP-15-0000534 (consol.) 2016 WL 7324120 (Haw. App. Dec. 16, 2016) (SDO). In Parras, this court rejected the State's argument concerning the need for a detective's testimony that he made multiple attempts to serve the defendant during the twenty-five days period between the establishment of probable cause and the defendant's arrest. 2016 WL 7324120 at *4. This court concluded:

> On this record [(which included offers of proof as to the detective's testimony)], the circuit court did not abuse its discretion when it decided it did not need to have Detective Phromsiri testify. Probable cause was established on October 3, 2013, and Parras was arrested without a warrant twenty-five days later, on October 28, 2013. Even if Detective Phromsiri testified to his attempts to locate Parras during those twenty-five days, and even though the delay in locating Parras was an obstacle to arresting him, we cannot say that a warrantless arrest twenty-five days later is appropriate under HRS § 803-5. Rather, under Keawe and Line, the police were required to obtain a warrant by the time Parras was arrested in this case.

Id.

is undisputed that HPD officers were able to serve Rosa to appear at the TRO hearing at Honolulu District Court.  His car was observed by the police at his residence.  Detective Rockett's efforts to build a strong case were certainly permissible, even commendable as the Circuit Court suggests, but they were in fact strategic and carefully planned to aid in Rosa's eventual prosecution, rather than constituting barriers to making an arrest or obtaining an arrest warrant.  As the Circuit Court found, on the day Rosa was arrested (a Friday), HPD obtained a search warrant for his home and could have obtained an arrest warrant, but elected not to.  Indeed, Dectective Rockett's post-arrest warrantless arrest affidavit relied entirely on facts gathered on or before January 12, 2014, to support probable cause for Rosa's arrest and extended restraint.

Here, the police simply decided that waiting days, if not weeks, until January 31, 2014, to arrest Rosa was appropriate because they believed he would be at a court hearing and, presumably, they thought that would be a convenient way to pick him up.  At the March 3, 2015 hearing, Detective Rockett was asked about her understanding of the circumstances where she would need to get a warrant before arresting an individual.  She responded:

> It's my understanding that I would need an arrest warrant if a suspect has been identified and he hasn't been located in many months, maybe like six months.  The other times I've

> seen an arrest warrant is when a suspect is injured, is
> confined in the hospital, and is going to be there for a
> prolonged period of time.  Those are the only two occasions
> I'm familiar with, I personally am familiar with.

Detective Rockett's understanding is inconsistent with the immediacy requirement for a warrantless arrest under Hawaiʻi law.

Finally, we note that the Circuit Court appeared to give significant weight to the fact that HPD officers did not personally witness the events that established probable cause to arrest Rosa.  This reliance was misplaced.  We recognize that in many instances where a warrantless arrest is authorized under HRS § 803-5, the probable cause for the arrest will stem from a police officer's observations.  However, that does not support a conclusion that if probable cause is otherwise established, the immediacy element for a warrantless arrest pursuant to HRS § 803-5 need no longer be satisfied.

We conclude that Rosa's warrantless arrest was unlawful and the Circuit Court erred in concluding that, pursuant to HRS §§ 803-1 and 803-5, HPD did not violate Rosa's constitutional rights by not obtaining a warrant of arrest.

As the supreme court explained in Keawe:

> Ordinarily, when a defendant is arrested unlawfully, the
> proper remedy is to suppress the evidence collected as a
> result of the arrest.  As we have stated:
>
>> "Closing the courtroom door to evidence . . . [flowing
>> from] official lawlessness" is the customary remedy
>> for violations of fourth amendment rights, and the
>> public interest would be better served by suppressing

> the evidence obtained as a consequence of the unlawful arrests. For the exclusionary "rule is calculated to prevent, not to repair. Its purpose is to deter -- to compel respect for the constitutional guaranty in the only effectively available way -- by removing the incentive to disregard it."

Keawe, 107 Hawaiʻi at 7, 108 P.3d at 310 (quoting State v. Furuyama, 64 Haw. 109, 122-23, 637 P.2d 1095, 1104 (1981)) (further citations and some brackets omitted).

Rosa argues that since his arrest on January 31, 2014 was illegal, the seizure of Rosa's Phone in connection with that arrest was a violation of his constitutional rights to be secure from unreasonable searches and seizures; and therefore Rosa's Phone and evidence obtained therefrom should have been suppressed. The State argues that Rosa's Phone would have ultimately been seized because Rosa would inevitably have been arrested and his cell phone would have been seized at that time subject to a lawful arrest. Alternatively, the State argues that if Rosa had not had Rosa's Phone in his possession at the time of his arrest, a search warrant would inevitably have been obtained to seize the phone because a lawful search warrant was obtained to search the contents of Rosa's Phone. Thusly, the State submits that it has demonstrated by clear and convincing evidence that any evidence from Rosa's Phone that was used at trial would have been discovered by lawful means, even if Rosa's arrest was illegal.

Hawaiʻi courts have recognized the inevitable discovery doctrine. Under the inevitable discovery doctrine, the State has the burden "to present clear and convincing evidence that any evidence obtained in violation of article I, section 7, would inevitably have been discovered by lawful means before such evidence may be admitted under the inevitable discovery exception to the exclusionary rule." State v. Lopez, 78 Hawaiʻi 433, 451, 896 P.2d 889, 907 (1995). In this case, however, the Circuit Court ruled that Rosa's arrest was lawful, and therefore the seizure of Rosa's Phone incident to his arrest was lawful. Accordingly, the Circuit Court never reached the issue of inevitable discovery and made no ruling on, for example, whether the data content of Rosa's Phone "would have still been there" if Rosa's Phone was recovered at some other time after Rosa's illegal arrest. See id. at 452, 896 P.2d at 908.

In Lopez, although the trial court had not ruled on whether the evidence in question would have been inevitably discovered, the supreme court nevertheless reviewed the entire record and concluded that the record was devoid of evidence necessary to show that the fruits of the illegal search would have been inevitably discovered. Id. The supreme court has since clarified that it is error for this court to make rulings that require determination of questions of fact and that the proper course of action is for this court to remand a case to a

finder-of-fact for such determinations.  See, e.g., State v.
Pitolo, 144 Hawaiʻi 100, 108-09, 436 P.3d 1183, 1191-92 (2019)
(holding that the Intermediate Court of Appeals erred in ruling
based on its own review of the record on appeal, rather than
remanding the case).  Here, we conclude that factual findings are
necessary to determine whether the prosecution met its burden to
establish that there was clear and convincing evidence that the
data retrieved from Rosa's Phone would have been inevitably
discovered.  Thus, this case must be remanded for further
proceedings to determine whether the evidence obtained from
Rosa's Phone should have be suppressed.

      B.   Rosa's Motion for A New Trial

Rosa contends that the Circuit Court erred in denying
the Motion for New Trial on two grounds, which are addressed
below.

HRS § 635-56 (2016) provides:

> **§ 635-56  Grounds for new trial**.  In any civil case or
> in any criminal case wherein a verdict of guilty has been
> rendered, the court may set aside the verdict when it
> appears to be so manifestly against the weight of the
> evidence as to indicate bias, prejudice, passion, or
> misunderstanding of the charge of the court on the part of
> the jury; or the court may in any civil or criminal case
> grant a new trial for any legal cause.

Hawaiʻi Rules of Penal Procedure (**HRPP**) provide:

> **Rule 33. NEW TRIAL**.
> The court on motion of a defendant may grant a new
> trial to the defendant if required in the interest of
> justice. If trial was by the court without a jury, the court
> on motion of a defendant for a new trial may vacate the
> judgment if entered, take additional testimony and direct

> the entry of a new judgment. A motion for a new trial shall be made within 10 days after verdict or finding of guilty or within such further time as the court may fix during the 10-day period. The finding of guilty may be entered in writing or orally on the record.

HRPP Rule 33.

### 1. Impartial Jury

Rosa argues that the Circuit Court erred in denying his motion for a new trial because it appeared that Juror 45, who became the jury foreperson, may not have been fair and impartial towards Rosa because Juror 45 may have been untruthful about whether he worked at Handi-Van during the same time as Rosa.

> A motion for a new trial based on juror misconduct can be based upon (1) failure of one or more jurors to respond truthfully to questions posed during *voir dire*, or (2) misconduct by one or more jurors during the course of the trial. In either event, the ultimate inquiry is whether the misconduct deprived the defendant of the fundamental right to a trial by twelve impartial jurors. If any member or members of the jury was shown not to be impartial, the trial court's failure to grant a new trial is an abuse of discretion.

State v. Adams, 10 Haw. App. 593, 599, 880 P.2d 226, 231 (1994) (citations omitted). The supreme court has further provided that:

> [W]hen a defendant in a criminal case claims a deprivation of the right to a fair trial by an impartial jury,
>
> > the initial step for the trial court to take . . . is to determine whether the nature of the [alleged deprivation] rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury . . . . And whether it does rise to the level of substantial prejudice . . . is ordinarily a question committed to the trial court's discretion. . . .
> >
> > Where the trial court does determine that such [alleged deprivation] is of a nature which could substantially prejudice the defendant's right to a

> fair trial, a rebuttable presumption of prejudice is raised. The trial judge is then duty bound to further investigate the totality of circumstances surrounding the [alleged deprivation] to determine its impact on jury impartiality. The standard to be applied in overcoming such a presumption is that the [alleged deprivation] must be proved harmless beyond a reasonable doubt.

State v Furutani, 76 Hawaiʻi 172, 180-81, 873 P.2d 51, 59-60 (1994) (citations omitted).

Here, Rosa does not point to where in the record the Circuit Court failed to act on any concern over Juror 45 that Rosa raised; rather, Rosa now argues that:

> [Rosa] was never consulted by prior counsel [DPD Ting] as to [Juror 45]'s employment with Handi-Vans. Prior counsel should have known the relevance and possible prejudice since he knew of [Rosa]'s prior employment history with the same company. [Rosa] was not consulted in any meaningful context about the questioning of juror 45 out of the presence of the jury. When juror 45 said that he never knew [Rosa] or worked with him, prior counsel should have consulted [Rosa].

Further, Rosa points to no instance of misconduct by Juror 45 but argues that "it appears the foreperson may not have been fair and impartial[.]" (Emphasis added).

The Circuit Court issued the following FOFs:

> 1. On October 20, 2016, both the State and defense received the jury packet for the instant case. The packet consisted of the jury list and redacted juror cards.
>
> 2. On Juror Card 45, under item 13 asking for present or last employer and occupation, Juror No. 45 wrote "OTS Handi-Van."
>
> 3. On October 24, 2016, a jury trial commenced before this Honorable Court. Defendant was represented by [Mr. Ting].
>
> 4. During jury selection, Juror No. 45 was first seated as Alternate Juror No. 1.

5.  Both the State and defense had an opportunity to voir dire Juror No. 45.

6.  Neither the State nor the defense challenged Juror No. 45 for cause, or elected to exercise a peremptory challenge on this juror.

7.  After the jury was impaneled and sworn in, a juror was dismissed and Juror No. 45 was called to fill Chair 6.

8.  On November 2, 2016, Defendant testified. Defendant provided his background information, including employment history.  One of Defendant's prior places of employment was with Handi-Van.

9.  Defendant did not provide specific information on dates of employment, the nature of his work, or position(s) with the Handi-Van.

10. During the recess following Defendant's testimony, Juror No. 45 asked to address the Court.

11. After the other jurors cleared the room, Juror No. 45 notified the Court that he is currently employed with the Handi-Van.

12. The Court engaged in a colloquy with Juror No. 45 to find out more information. Juror No. 45 explained that while he and Defendant may have been employed by the handi-Van at the same time, Juror No. 45 did not know and had not worked with Defendant.

13. Juror No. 45 assured the Court that despite this common employment, he could remain fair and impartial.

14. After Juror No. 45 addressed the Court, the Court asked both the State and defense if either party had any questions for this juror.

15. Both the State and defense declined to ask Juror No. 45 any further questions.

16. Juror No. 45 was released from the courtroom.

17. After Juror No. 45 left the courtroom, neither the State nor the defense objected to Juror No. 45 remaining on the panel in Chair 6.

The record shows that it was Juror 45 that first raised the issue that he might have worked at Handi-Van at the same time as Rosa - after Rosa's testimony, which included Rosa's having worked with Handi-Van.  The Circuit Court engaged in a colloquy

35

with Juror 45 and was satisfied that Juror 45 did not know Rosa. Rosa's defense was given an opportunity to ask questions or to object to Juror 45, but did not do so.

The Circuit Court's November 13, 2017 FOFs/COLs/Order on New Trial provided that there was no evidence of a history between Juror 45 and Rosa, and that Rosa's arguments on Juror 45 not being impartial were "speculation" where there was no evidence that Juror 45 held any bias and/or manipulated the other jurors. Rather, the court found that the record showed that Juror 45 "assured the Court that he could remain fair and impartial" and that when the jury was polled all twelve responded that the verdict "accurately represented and reflected their respective votes."

The Circuit Court's decision to deny Rosa's Motion for New Trial based on his concerns about Juror 45 did not clearly exceed the bounds of reason or disregard rules or principles of law or practice to Rosa's substantial detriment. See Furutani, 76 Hawaiʻi at 179, 873 P.2d at 58. Accordingly, we conclude that the Circuit Court did not abuse its discretion in denying Rosa's Motion for New Trial on this ground.

2. Compulsory Process

Rosa contends that the Circuit Court erred in denying his Motion for New Trial on grounds of denial of compulsory process. Rosa argues that this failure occurred when DPD Ting

did not subpoena witnesses that Rosa requested and that were listed in his witness list, resulting in Rosa being deprived of his constitutional right to present witnesses in his own defense, and that the Circuit Court's failure was when it did not engage in any colloquy with Rosa on the witnesses that he did or did not want called.

"The due process guarantee of the Federal and Hawaiʻi constitutions serves to protect the right of an accused in a criminal case to a fundamentally fair trial." State v. Acker, 133 Hawaiʻi 253, 281, 327 P.3d 931, 959 (2014) (citation and internal quotation marks omitted). "[A] fundamental element of due process of law is the right of compulsory process. The right to compulsory process affords a defendant in all criminal prosecutions, not only the power to compel attendance of witnesses, but also the right to have those witnesses heard." Id. (citations and internal quotation marks omitted). "However, this right is subject to limitations, the most important of which, is that the defendant may only obtain witnesses who can give 'relevant and beneficial testimony for the defense.'" State v. Diaz, 100 Hawaiʻi 210, 226, 58 P.3d 1257, 1273 (2002) (citing State v. Savitz, 67 Haw. 59, 60-61, 677 P.2d 465, 466-67 (1984)).

> In Savitz, the defense made two offers of proof to establish that the witness would provide relevant and beneficial testimony. First, the witness would testify that the defendant was not at the scene of the burglary for which he was being tried. Second, the witness had a conversation with the prosecution's witness (prior to trial), which would help

> impeach the prosecution witness. [The Hawaiʻi Supreme Court] ruled that the defense's offer of proof was "purely conjectural and without any foundation nor supported by any basis in fact."

Id. (citation and footnote omitted).

Rosa now argues that his witnesses were not called because DPD Ting "simply exercised his own discretion in deciding that the defense would not present any witnesses to corroborate [Rosa] at trial." Rosa further argues that, given the witness list and the trial continuances (to locate defense witnesses), the court should have known to colloquy Rosa.

In denying Rosa's Motion for New Trial on grounds of denial of compulsory process, the Circuit Court stated that:

> [Rosa] failed to support his assertion with any proof that the named witnesses would have benefitted his defense, and he points to no evidence that [DPD] Ting neglected to contact these witnesses. The record reflects that [DPD] Ting moved for multiple continuances, at [Rosa]'s request, to secure defense witnesses. [Rosa] presented nothing to suggest these witnesses . . . would have even testified in a manner helpful to his case. Without a showing that these witnesses were relevant and beneficial, [Rosa]'s right to Compulsory Process was not denied.

The Circuit Court considered and addressed Rosa's arguments. The Circuit Court cited the requirement for a movant to show ineffective assistance of counsel "based on the failure to obtain witnesses" which "must be supported by affidavits or sworn statements describing the testimony of the proffered witnesses." See State v. Richie, 88 Hawaiʻi 19, 39, 960 P.2d 1227, 1247 (1998) (citations omitted). The Circuit Court also noted that "the calling of witnesses is generally a strategic

decision for defense counsel" and that "matters presumably within the judgment of counsel, like *trial strategy*, 'will rarely be second-guessed by judicial hindsight.'" See id. The Circuit Court based its ruling on the fact that Rosa failed to support his claim with affidavits or sworn statements of the testimonies of the named witnesses. Thus, as the Circuit Court observed, it is entirely speculative that there would be a different outcome had DPD Ting called those witnesses.

Lastly, Rosa provides no authority, and we find none, requiring a trial court to colloquy a defendant regarding whether the defense has presented all of the witnesses that the defendant wants.

We conclude that the Circuit Court did not clearly exceed the bounds of reason or disregard rules or principles of law or practice to Rosa's substantial detriment in denying the Motion for a New Trial on these grounds. See State v. Austin, 143 Hawaiʻi 18, 29, 422 P.3d 18, 29 (2018). Accordingly, the Circuit Court did not abuse its discretion in denying Rosa's Motion for New Trial.

V.    CONCLUSION

For these reasons, the Circuit Court's March 25, 2015 FOFs/COLs/Order on Motion to Suppress is vacated, and this case is remanded for further proceedings consistent with this Opinion. If, on remand, the State fails to meet its burden on the issue of

inevitable discovery, then Rosa is entitled to relief from the January 2, 2018 Judgment and a new trial.

On the briefs:

Nelson W.S. Goo,
for Defendant-Appellant.

Brian R. Vincent,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge